D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

               Plaintiff,

      -against-

DIANE SACO and PATRICIA HARGETT, as
Administrator of the Estate of Suzanne Kusulas,

               Defendants.*

-----------------------------------------------------------------------X

PATRICIA HARGETT, as Administrator of the
Estate of Suzanne Kusulas, as Assignee of the
Rights of Diane Saco,

               Plaintiff,

      -against-

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

               Defendant.*

-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CV-5633 (NGG) (ST)**

**15-CV-634 (NGG) (ST)**

NICHOLAS G. GARAUFIS, United States District Judge.

    The motion before the court is the latest volley in a long-running dispute between the

Government Employees Insurance Company ("GEICO") and Suzanne Kusulas[1] stemming from

a February 23, 2006, car accident between Kusulas and Diane Saco. A brief summary of the

---

* According to a suggestion of death filed with the court on November 29, 2018, Patricia Hargett died on October 2, 2018. (See Nov. 29, 2018, Letter (Dkt. 155).) In accordance with Federal Rule of Civil Procedure 25(a)(1), the law firm representing the Estate of Suzanne Kusulas intends to move to substitute a named representative of the Estate within 90 days of having filed the suggestion of death. (See id.) As of the date of this memorandum and order the motion for substitution has not been submitted, so the court issues this opinion under the existing caption.

[1] After Kusulas died on October 17, 2016, Patricia Hargett, the Administrator of Kusulas's estate, was substituted as a named party in this action. (Stipulation to Amend the Captions (Dkt. 52 in No. 15-CV-634).)

1

previous actions in this case is necessary before proceeding further: In 2007, Kusulas instituted an action against Saco in Kings County Supreme Court (the "Underlying Action"). In 2010, the state court granted Kusulas's motion for summary judgment as to liability, holding that Saco was fully liable for Kusulas's injuries resulting from the accident; after a damages trial, a jury awarded Kusulas $3,369,066.75 in compensatory damages. Saco, who held two insurance policies issued by GEICO, demanded that GEICO pay the full jury award. GEICO then sought a declaratory judgment from this court that (1) GEICO was not required to make any payments in excess of the limits on the GEICO policies (the "Policies") held by Saco; (2) the Policies do not require payment for Saco's personal attorney's fees; and (3) GEICO is not subject to any claim for bad faith in relation to its obligations to Saco. In her answer, Kusulas—to whom Saco assigned her rights against GEICO—included two counterclaims: that (1) GEICO breached its contract in failing to tender to Saco the full policy limits plus prejudgment interest on that amount; and (2) GEICO acted in bad faith towards Saco in its failure to settle the Underlying Action. Last year, following cross-motions for summary judgment, this court concluded that GEICO was entitled to summary judgment as to its liability for prejudgment interest in excess of the policy limits, but denied GEICO's motion for summary judgment as to whether it discharged its duty of good faith to Saco in the Underlying Action. (See Mar. 30, 2017, Mem. & Order ("2017 M&O") (Dkt. 133 in No. 12-CV-5633; Dkt. 44 in No. 15-CV-634).)[2]

Before the court is a motion in limine (also described as a motion for partial summary judgment) by GEICO to limit damages in the forthcoming trial. (GEICO Mot. for Partial Summ. J. ("Mot.") (Dkt. 148).) GEICO argues that its obligation to make monthly payments to Kusulas for future pain and suffering and future medical expenses terminated upon her death, thus

---

[2] All further record citations refer to the docket in GEICO v. Saco, No. 12-CV-5633, except as otherwise noted.

limiting the future-damages portion of the estate's judgment to $300,848.07. (Mem. in Supp. of Mot. ("Mem.") (Dkt. 148-16) at 4-8.) Patricia Hargett, in her capacity as administrator of Kusulas's estate (the "Estate"), opposes this motion. (Estate Mem. in Opp'n to Mot. ("Estate Opp'n") (Dkt. 149).) For the following reasons, the court DENIES GEICO's motion to limit damages.

## I.    BACKGROUND

### A.    Facts

A recounting of the events leading to the court's involvement in this matter is set forth in the court's prior opinion in this case. (See 2017 M&O at 2-4.) The following statement of facts, which restates and supplements the facts of the case as necessary to decide the motion before the court, is largely taken from the parties' Local Rule 56.1 statements and deposition testimony, with the evidence "constru[ed] . . . in the light most favorable to the non-moving party." Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks and citation omitted). (See GEICO Supp. Rule 56.1 Statement of Material Facts ("GEICO 56.1") (Dkt. 148-15); Estate Resp. to GEICO 56.1 ("Estate 56.1") (Dkt. 149-1).) The parties agree on the following facts, except where otherwise noted.

On March 5, 2012, a jury in the Underlying Action considering only the issue of damages awarded Kusulas a verdict of $3,369,066.75 against Saco. (GEICO 56.1 ¶ 1.) On May 11, 2012, GEICO paid Kusulas $1,283,500.00. (Id. ¶ 2.) Following further proceedings, the state court entered judgment for Kusulas in the amount of $2,857,900.55 on October 10, 2014 (the "Underlying Judgment"). (Id. ¶ 3.) Significantly for the motions considered here, the Underlying Judgment awarded a total of $1,204.497.75 based on future damages to Kusulas: $41,364.12 per year, plus four-percent annual interest, for future pain and suffering, "extending

for the shorter of" 10 years or the life of Kusulas; and $18,489.84 per year, plus four-percent annual interest, for future medical expenses, "extending for the shorter of" 36 years or the life of Kusulas. (Id. ¶¶ 5-6; see J. in Underlying Action ("Underlying J.") (Dkt. 148-10) at 4-5.) The damages were made retroactive to the verdict date of March 5, 2012. (GEICO 56.1 ¶ 4.) The Underlying Judgment also directed Saco "to offer and purchase and guarantee payment to [Kusulas] of an annuity contract" for these annual payments. (Underlying J. at 4; see GEICO 56.1 ¶ 7.) Saco did not make any of these periodic payments, nor did she purchase an annuity contract to satisfy the payments. (See GEICO Aug. 1, 2017, Letter (Dkt. 141) at 1.) Kusulas, meanwhile, did not seek to have the judgment modified to require a lump-sum payment for future damages. (See id. at 1-2.)

On December 23, 2014, Saco assigned her rights against GEICO to Kusulas in exchange for a promise that Kusulas would not execute her judgment against Saco or any of Saco's personal assets. (GEICO 56.1 ¶ 8; see Estate 56.1 ¶ 8.) On October 17, 2016, Kusulas died. (GEICO 56.1 ¶ 9.) Hargett was appointed administrator of the Estate on May 5, 2017. (Id. ¶ 10.) Hargett died on October 2, 2018, and the Estate has not yet named a new administrator. (See Nov. 29, 2018, Letter (Dkt. 155).)

B.    **Procedural History**

On March 31, 2017, this court denied GEICO's motion for summary judgment as to whether it discharged its duty of good faith to Saco in the Underlying Action. (2017 M&O.) On August 1, 2017, GEICO requested a pre-motion conference to address the issue of whether Kusuas's death limits the amount of future damages she can collect at trial. (GEICO Aug. 1, 2017, Letter.) The court granted GEICO leave to move for an order resolving this question

(Aug. 9, 2017, Min. Entry) and the motion was fully briefed on November 20, 2017 (see Mot.; Mem.; Estate Opp'n; GEICO Reply (Dkt. 150)).[3]

## II. SUMMARY OF RELEVANT LAW

Before proceeding to the legal questions underpinning GEICO's motion, the court provides a brief overview of legal principles relevant to this action, namely, Article 50-B of the New York Civil Practice Law and Rules ("CPLR") and the rules governing bad-faith actions and the assignment of claims.

### A. Article 50-B

In 1985, the New York State Legislature confronted what it believed to be a significant problem. Under the law at the time, all tort damages—including future damages—were payable immediately in a lump sum of the present value of the award. See Desiderio v. Ochs, 791 N.E.2d 941, 943 (N.Y. 2003). The State Legislature and Governor Mario Cuomo expressed their concern at an "alarming" increase in insurance costs—costs which they claimed were "ultimately borne by the consumer." Governor's Program Bill Mem., reprinted in N.Y. Bill Jacket, L. 1985, ch. 294, at 7. The State Legislature attempted to solve these problems through the enactment of CPLR Articles 50-A (in 1985) and 50-B (in 1986), which it hoped would "moderate the cost of [insurance] premiums, while assuring adequate and fair compensation for injured persons."[4] See Alisandrelli v. Kenwood, 724 F. Supp. 235, 238 (S.D.N.Y. 1989). For the purposes of this case, only the substance of Article 50-B is relevant; however, because the two laws are "cognate[s]" of each other, the court considers the legislative and interpretive history of both articles in tandem.

---

[3] GEICO originally also sought a declaration regarding the maximum amount that Hargett, as administrator of the Estate, can collect, but it has since withdrawn that claim. (GEICO Reply at 1 n.1.)

[4] The State Legislature based its recommendations on those put forward by the Special Advisory Panel on Medical Malpractice in January 1976. Governor's Program Bill Mem., reprinted in N.Y. Bill Jacket, L. 1985, ch. 294, at 8; see Special Advisory Panel on Medical Malpractice, State of New York, Report (1976) [hereinafter Report].

Desiderio, 791 N.E.2d at 951 (Read, J., concurring); see Stinton v. Robin's Wood, Inc., 842

N.Y.S.2d 477, 481 (App. Div. 2007); see also 10 Jack Weinstein, Harold B. Korn & Arthur R.

Miller, New York Civil Practice: CPLR ¶ 5041.00, at 50-B-6 (2d ed. 2015) ("[T]he provision of

the pre-2003 amendments to Article 50-A are substantively identical to those in Article 50-B

. . . .").[5]

The "dramatic" changes enacted by Article 50-B may seem "technical and complicated,"

but the law's "basic operation is easily stated." Rohring v. City of Niagara Falls, 638 N.E.2d 62,

63 (N.Y. 1994); 10 Weinstein, Korn & Miller, supra, ¶ 5041.01, at 50-B-6. While past damages

are still paid in a lump sum, the award of future damages, "which are awarded by the jury

without reduction to present value," is now bifurcated: "The first $250,000 in future damages is

paid as a lump sum. The remainder, after subtraction of attorney's fees and other adjustments, is

to be paid in periodic installments." Rohring, 638 N.E.2d at 63 (citations omitted); see

CPLR 5041(b), (e).[6] In order to ensure the payment of future damages above $250,000, "the

court must enter a judgment for the amount of the present value of an annuity contract that will

provide for the payment of the remaining amounts of future damages." 10 Weinstein, Korn &

Miller, supra, ¶ 5041.02, at 50-B-7; see CPLR 5041(e). Courts of New York have interpreted

this provision as requiring the defendant to purchase an annuity contract, see Desiderio, 791

N.E.2d at 943; Rohring, 638 N.E.2d at 63, though Article 50-B is silent as to what happens if the

---

[5] In 2003, the State Legislature repealed and amended certain portions of Article 50-A. See Weinstein, Korn & Miller, supra, ¶ 5031.01, at 50-A-8. Accordingly, unless otherwise stated, all references to Article 50-A refer to the law as enacted in 1985.

[6] Parties are free to ignore this provision of the law and come to a separate agreement providing for a lump-sum payment of non-economic damages greater than $250,000. CPLR 5041(f). In this case, however, the parties did not make any such agreement.

defendant fails to do so.[7] Additionally, in a "substantial change in the law of damages," a defendant's obligation to pay future non-economic damages terminates upon the plaintiff's death. 10 Weinstein, Korn & Miller, supra, ¶ 5045.00, at 50-B-28; see CPLR 5045(a). The structured-judgment provisions of Article 50-B do not apply to future-damages awards of $250,000 or less. See Stinton, 842 N.Y.S.2d at 482.

Through these changes, the State Legislature sought to reduce insurance premiums "while assuring adequate and fair compensation for injured persons." Governor's Program Bill Mem., reprinted in N.Y. Bill Jacket, L. 1985, ch. 294, at 7; see Doe v. State, 602 N.Y.S.2d 990, 993-94 (Ct. Cl. 1993) ("[A]rticle 50-B provides a useful mechanism for ameliorating the burden of tort liability for defendants and their insurers without reducing the compensation to which plaintiffs are entitled." (citation and internal quotation marks omitted)). This broad goal can be broken down into three objectives. First, the rule preserves a plaintiff's right to "fair compensation" while limiting his or her ability to recover for future damages beyond those for which a need actually arises. See 1986 Legislative Recommendations, Governor's Program Bills, reprinted in Governor's Bill Jacket, L. 1986, ch. 682, at 42. Second, on a similar note, the rule prevents the plaintiff's family or next of kin from recovering a "windfall" in the event that the plaintiff dies before all future damages are paid out. See 10 Weinstein, Korn & Miller, supra, ¶ 5045.00, at 50-B-28 (discussing the "legislative determination that compensation of pain and suffering should inure to the benefit of the victim"). Third, the rule attempts to reduce the cost of judgments—and, accordingly, the burden of liability on defendants and their insurers—"by permitting the insurer to retain and invest the balance of the award before installments come

---

[7] Of some relevance is the provision that, if a judgment debtor fails to make a payment under the annuity contract, the plaintiff may "petition the court which rendered the original judgment for an order requiring payment by the judgment debtor of the outstanding payments in a lump sum," CPLR 5044; accord Alisandrelli, 724 F. Supp. at 239.

due." Governor's Program Bill Mem., reprinted in N.Y. Bill Jacket, L. 1985, ch. 294, at 8; see 1986 Legislative Recommendations, Governor's Program Bills, reprinted in Governor's Bill Jacket, L. 1986, ch. 682, at 41.

### B.  Bad-Faith Actions

#### 1.  Overview

It is a "well settled" and "enduring" principle of New York law that an insurer "may be held liable for the breach of its duty of 'good faith' in defending and settling claims over which it exercises exclusive control on behalf of its insured." Pavia v. State Farm Mut. Auto. Ins. Co., 626 N.E.2d 24, 26 (N.Y. 1993) (citations omitted); see Selective Ins. Co. of Am. v. County of Rensselaer, 47 N.E.3d 458, 462 (N.Y. 2016). "A bad faith case is established where the liability is clear and the potential recovery far exceeds the insurance coverage." DiBlasi v. Aetna Life & Cas. Ins. Co., 542 N.Y.S.2d 187, 191 (App. Div. 1989). A bad-faith cause of action cannot lie "for conduct amounting to ordinary negligence"; rather, success on such a claim requires a showing "that the insurer's conduct constituted a 'gross disregard' of the insured's interests." Pavia, 626 N.E.2d at 27. As this court has previously recounted (see Feb. 18, 2014, Mem. & Order (Dkt. 48) at 12), bad-faith actions sound in contract, not tort, because of "the general principle that a covenant of good faith and fair dealing is implied in all contracts, including insurance policies." Smith v. Gen. Accident Ins. Co., 697 N.E.2d 168, 170 (N.Y. 1998); see Kumar v. Am. Transit Ins. Co., 854 N.Y.S.2d 274, 277 (App. Div. 2008) (Peradotto, J., dissenting); DiBlasi, 542 N.Y.S.2d at 193.

But an action based on the breach of the implied covenant of good faith and fair dealing is no ordinary contract action. In an action where the insurer is accused of "violat[ing] its implied obligation to act in good faith [by] fail[ing] to make a reasonable settlement of a claim

within policy limits," the court may impose "compensatory damages in excess of the policy limits." AFIA v. Cont'l Ins. Co., 527 N.Y.S.2d 420, 421 (App. Div. 1988); see Soto v. State Farm Ins. Co., 635 N.E.2d 1222, 1224 (N.Y. 1994); DiBlasi, 542 N.Y.S.2d at 192, 195; see also Aviva Abramovsky, Reinsurance: The Silent Regulator?, 15 Conn. Ins. L.J. 345, 402 (2009) (describing bad-faith liability in excess of the policy limits as a measure of "extracontractual damages"). Although bad-faith actions sound in contract, the New York Court of Appeals has explained that the amount of the excess judgment is a permissible measure of damages in these cases because it is

> a class of harm that naturally and foreseeably flows from an insurer's failure to accept a pretrial settlement offer within the policy limits. Accordingly, when the harm has been caused by the insurer's breach of its obligation to perform in good faith, the insurer should be required to remedy that harm by paying the excess judgment.

Soto, 635 N.E.2d at 1224 (citations omitted); see also Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267, 272 n.3 (2d Cir. 1987) (stating that an insurer that is found to have engaged in a bad-faith denial of coverage "is liable for the full amount which will compensate the insured for all the damage caused by the insurer's breach of express and implied obligations of the contract"). By contrast, New York courts have traditionally not permitted the imposition of consequential bad-faith damages for emotional distress, injury to credit, or lost business opportunities, as these injuries are "speculative, remote and could not be within the contemplation of the parties at the time of the execution of the insurance contract." DiBlasi, 542 N.Y.S.2d at 194.

An award of damages exceeding the limits of the insurance policy is often classified as "punitive in nature" owing to the "disingenuous" and "dishonest" behavior necessary to support bad-faith liability on this ground. See CBLPath, Inc. v. Lexington Ins. Co., 900 N.Y.S.2d 462, 465 (App. Div. 2010) (citing Gordon v. Nationwide Mut. Ins. Co., 285 N.E.2d 849, 854 (N.Y.

1972) (plurality opinion)); see also Cohen v. N.Y. Prop. Ins. Underwriting Ass'n, 410 N.Y.S.2d 597, 600 (App. Div. 1978) (distinguishing between "breach of contract based only on a failure to make reasonable settlement of a claim within the policy limits" and "breach of implied conditions of the contract to act in its performance in good faith in refusing to settle within the policy limits"). This measure of damages is distinct from the normal imposition of punitive damages, which are not permissible in the context of a bad-faith action. See Soto, 635 N.E.2d at 1224; AFIA, 527 N.Y.S.2d at 422.

Under controlling circuit precedent, a bad-faith cause of action accrues against an insurer as soon as the excess judgment against the insured becomes final, regardless of whether the insured has the ability to pay any part of the excess judgment. See Pinto v. Allstate Ins. Co., 221 F.3d 394, 402-03 (2d Cir. 2000). In rejecting the countervailing so-called "payment rule," courts have given three general reasons for extending the cause of action. First, courts have expressed concern that an insurer who has acted in bad faith should not be able to avoid judgment—thus, effectively, reaping a windfall—simply because its policyholder is judgment-proof. Id. at 403. Second, allowing an insurer to escape liability for the excess judgment if the insured is insolvent would discourage settlement. Id. After all, why would an insurer that knows its insured is insolvent ever choose to settle a claim at the policy limits? If the case goes to trial and liability is not found, the insurer would end up paying nothing; if the case goes to trial and liability is found, the most the insurer would have to pay is the limit of the policy. Because there would be no possibility in this circumstance that the insurer would end up on the hook for more than the limits of the policy, the insurer would never have good reason to settle, thereby contradicting the purpose of bad-faith actions. See id. at 399 ("The availability of a bad faith cause of action encourages settlements that are in the insured's best interests and also discourages insurance

companies from refusing to settle as a matter of policy." (citing Pavia, 626 N.E.2d at 27)). Finally, permitting a bad-faith action to proceed regardless of the insured's financial status recognizes "the very real harm that an excess judgment can work on an insured's credit and financial future." Id. at 403; accord Pavia v. State Farm Mut. Auto. Ins., 589 N.Y.S.2d 510, 517 (App. Div. 1992), rev'd on other grounds, Pavia, 626 N.E.2d 24; Henegan v. Merchs. Mut. Ins. Co., 294 N.Y.S.2d 547, 548 (App. Div. 1968).

"Generally, an insured who faces an excess judgment and believes his insurer failed to settle the liability action against him in good faith, assigns his claim to the plaintiff in that liability action, who then initiates a bad faith cause of action against the insurer." Joan B. Lefkowitz, New York Third Party Bad Faith: Is It a Plaintiff's Dream or a Defendant's Nightmare?, 12 Pace L. Rev. 543, 545 n.12 (1992) (citation omitted); see Pinto, 221 F.3d at 403. In other words, when a tort plaintiff secures an excess judgment against an insured party who is unable to pay the excess, the only way for the plaintiff to recover is by pursuing a bad-faith action against the insurer pursuant to an assignment by the insured.

2. Recent Developments

Until about a decade ago, the law as to bad-faith actions was fairly stable. As set forth above, courts in New York (1) recognize bad-faith actions; (2) treat such actions as contract, not tort, claims; (3) award damages in the amount of the excess judgment in the underlying action as a quasi-punitive remedy; (4) do not permit the imposition of consequential damages not within the contemplation of the insurer and insured at the time of contracting; (5) do not require the insured to have been able to pay part of the excess judgment; and (6) permit the insured to assign his or her claim to the plaintiff in the underlying tort action.

In 2008, the New York Court of Appeals for the first time recognized that consequential damages, which "do not so directly flow from the breach," may be proper in the context of a claim for breach of the covenant of good faith and fair dealing, so long as the damages were "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 886 N.E.2d 127, 130 (N.Y. 2008) (citation and quotation marks omitted); accord Panasia Estates, Inc. v. Hudson Ins. Co., 886 N.E.2d 135, 137 (N.Y. 2008) (companion case to Bi-Economy). It is unclear whether, and to what degree, the Bi-Economy decision affects third-party claims of bad faith, such as the one before the court. For one, the Court of Appeals has already stated that bad-faith damages in the amount of the excess judgment are proper because they "naturally and foreseeably flow[] from an insurer's failure to accept a pretrial settlement offer within the policy limits." Soto, 635 N.E.2d at 1224. Additionally, while Bi-Economy involved a bad-faith claim against a first-party insurer, rather than a liability insurer, no court has yet held that Bi-Economy's expansion of consequential damages does not apply to third-party claims; indeed, at least one court has applied Bi-Economy to permit consequential damages in a third-party case. See Handy & Harman v. Am. Int'l Grp., Inc., 2007 N.Y. Slip Op. 32366(U), 2008 WL 3999964 (Sup. Ct. N.Y. Cty. Aug. 25, 2008). Other courts have assumed that Bi-Economy applies to third-party bad-faith claims, while still precluding consequential damages based on the language of the insurance contracts at issue. See Int'l Rehab. Scis. Inc. v. GEICO, No. 12-CV-1225-A, 2014 WL 6387276, at *3-4 (W.D.N.Y. Nov. 14, 2014); cf. Hunter v. Hereford Ins. Co., 2015 N.Y. Slip Op. 51180(U), 2015 WL 4877682, at *2 (Civ. Ct. Queens Cty. Aug. 14, 2015) (rejecting plaintiff's claim of consequential damages because she was not suing pursuant to assignment by the insured).

## C.    Assignments

It is hornbook law that "[a]n assignee 'stands in the shoes of an assignor and thus acquires no greater rights than its assignor.'" Cortland St. Recovery Corp. v. Hellas Telecomms., S.a.r.l., 996 N.Y.S.2d 476, 489 (Sup. Ct. N.Y. Cty. 2014) (quoting Am. States Ins. Co. v. Huff, 990 N.Y.S.2d 489, 490 (App. Div. 2014)); accord Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc., 325 N.E.2d 137, 139 (N.Y. 1975). It is common practice for a personal-injury tortfeasor to assign her bad-faith cause of action to the plaintiff in exchange for an agreement by the plaintiff not to execute on the judgment against the tortfeasor. See Williams Paving Co. v. U.S. Fid. & Guar. Co., 413 N.Y.S.2d 73, 74 (App. Div. 1979) (upholding the validity of assignment of bad-faith claims). Accordingly, in a third-party bad-faith action, the plaintiff (the assignee) may bring whatever claim and receive whatever damages to which the insured party (the assignor) would have been entitled had she pursued the bad-faith claim as a direct action. See Home Ins. Co. v. United Servs. Auto. Ass'n, 692 N.Y.S.2d 121, 123 (App. Div. 1999) (noting that the assignee is entitled to damages to which the assignor would have been entitled); Kulak v. Nationwide Mut. Ins. Co., 366 N.Y.S.2d 927, 930 (App. Div. 1975) (Cardamone, J.) (stating that an assignee may recover compensatory damages in "the amount by which the prior tort judgment exceeded insured's policy coverage . . . plus interest"), rev'd on other grounds, 351 N.E.2d 735 (N.Y. 1976); see also Cirone v. Tower Ins. Co. of N.Y., 908 N.Y.S.2d 178, 179-80 (App. Div. 2010) (dismissing third-party bad-faith action because the assignor would be estopped from bringing the claim); Aetna Cas. & Sur. Co. v. McCullough, 341 N.Y.S.2d 424, 425 (App. Div. 1973) ("The assignee . . . tak[es] with the assignment all the right, title and interest theretofore possessed by the assignor." (citation omitted)).

## III. DISCUSSION

### A. Overview

GEICO's motion requires the court to synthesize Article 50-B and New York law on bad-faith actions and answer what both parties agree to be a question of first impression: whether, following the death of a victorious tort plaintiff, the amount of future damages recoverable in a subsequent third-party bad-faith action is limited by the plaintiff's death. GEICO argues that, because "the amount of damages in a bad faith action is the amount for which the insured is liable," the limit on Saco's liability imposed by Kusulas's death also prevents the Estate from pursuing those installments from GEICO. (GEICO Reply at 3; see Mem. at 5-6; see also GEICO Reply at 8-9 ("The right to recovery belongs to the insured, so the amount of damages depends upon the amount of exposure to the insured.").) GEICO claims that the Estate might be able to recover bad-faith damages for the entire amount of future damages if Kusulas had chosen to pursue a lump-sum judgment prior to her death, but the fact that she did not "prevents her estate from seeking one now." (GEICO Reply at 7.) In response, the Estate makes two principal points. First, it points out that, as discussed above, Article 50-B applies to tort actions, while bad-faith actions are "contractual in nature." (Estate Opp'n at 4.) Thus, it argues, Article 50-B does not apply to the instant action, which "pertain[s] to a bad faith suit by an insured against her insurance company, not an action to recover damages for personal injuries." (Id. at 5.) Second, the Estate argues that it would be "antithetical" to the purpose of bad-faith damages—which are intended to be "punitive in nature"—to apply Article 50-B to limit the Estate's recovery in this situation. (Id. at 5; see id. at 5-9.)

## B. Application

In interpreting a law of New York State, the court must "ascertain and give effect to the intent of the legislature." Kuhne v. Cohen & Slamowitz, LLP, 579 F.3d 189, 193 (2d Cir. 2009) (citation omitted); see N.Y. Cty. Lawyers' Ass'n v. Bloomberg, 979 N.E.2d 1162, 1167 (N.Y. 2012). "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself . . . ." Kuhne, 579 F.3d at 193 (quotation marks omitted); see N.Y. Cty. Lawyers' Ass'n, 979 N.E.2d at 1167. If the statutory text is ambiguous, the court may consult legislative history in order to align the interpretation of the statute with the purpose of its enactment. See Carlin v. Davidson Fink LLP, 852 F.3d 207, 214 (2d Cir. 2017); Anonymous v. Molik, 109 N.E.3d 563, 568 (N.Y. 2018); Auerbach v. Bd. of Educ., 654 N.E.2d 972, 974 (N.Y. 1995).

The question before the court is whether Article 50-B limits the Estate's ability to recover damages in an amount beyond those which had accrued at the time of Kusulas's death, or whether the Estate is permitted to recover bad-faith damages in the full amount awarded to Kusulas in the Underlying Action. This question is, in part, one of statutory interpretation. Accordingly, the court begins its analysis on by examining the plain text of Article 50-B. Because the plain text of Article 50-B is insufficient to resolve the instant question, the court must examine other sources of law, including judicial opinions concerning New York law on bad-faith damages and the legislative history of Article 50-B's enactment. The court ultimately concludes that Article 50-B does not limit the Estate's bad-faith damages in the manner claimed by GEICO and so the court denies GEICO's motion in limine.

1.    Text of Article 50-B

GEICO argues that Article 50-B applies to the Estate's bad-faith action because it "impacts the amount of future damages the [E]state can pursue against GEICO through its assignment from Saco." (GEICO Reply at 3.) GEICO's argument requires the court to closely examine three provisions of Article 50-B: CPLR 5045(a), which terminates a personal-injury defendant's obligation to pay future damages installments upon the death of the plaintiff; CPLR 5044, which permits the plaintiff to convert a structured judgment into a lump-sum judgment if the defendant fails to make timely payments; and CPLR 5043(b), which permits the plaintiff to move the court for a lump-sum judgment if the defendant has failed to post security within thirty days of the judgment. GEICO claims that these provisions of Article 50-B, taken together, "show[] that the legislature intended for future-damage installments to terminate upon the death of the judgment creditor unless the judgment creditor sought a lump-sum award prior to her death." (Id. at 6.) Accordingly, GEICO argues, because Kusulas did not seek a lump-sum award prior to her death, the court cannot order one now and the Estate is thus limited to receiving the damage payments that accrued prior to Kusulas's death. (See id. at 7.)

First, the court addresses the Estate's contention that Article 50-B does not apply to the action before the court because the Estate's claim sounds in contract, not tort. (See Estate Opp'n at 4.) The Estate is asking the wrong question: The court agrees that Article 50-B does not apply "to this matter," since the court is not tasked with "determin[ing] what judgment is to be entered on a verdict in an action to recover damages for personal injury," CPLR 5041. But that is irrelevant because the real question before the court is to what extent Article 50-B restricts the Underlying Judgment and whether such restriction affects the amount of damages the court may

award in this case. So the court must reject the Estate's argument that the contractual nature of its bad-faith action automatically forecloses GEICO's motion.

In fact, GEICO is basically correct in its characterization of the statute's operation. Article 50-B does indeed "limit future damages to those installments that are due prior to the death of the judgment creditor," except for cases in which the judgment debtor agrees otherwise "at the time [that] the security is posted." (GEICO Reply at 4-5.) See CPLR 5044, 5045(a).[8] The court may also enter a lump-sum judgment for all future damages in the event that the judgment debtor fails to post security. (See id. at 5-6 (citing CPLR 5043(b)).) Neither of those circumstances transpired here. But that is not the end of the discussion—the question remains whether the limitations imposed by Article 50-B foreclose the Estate from pursuing future bad-faith damages beyond the date of Kusulas's death. To answer that question, the court cannot focus on Article 50-B alone; rather, it must analyze the operation of bad-faith law.

2.  Bad-Faith Law

GEICO's argument with respect to the law on bad-faith damages is premised upon a mistaken view of the amount of damages available in the instant action. GEICO states that "the amount of damages in a bad faith action is the amount for which the insured is liable." (GEICO Reply at 3.) As a statement of law, this is incorrect: Numerous courts in New York have held that the measure of damages in a third-party bad-faith action is "the amount of the judgment in excess of the policy limits plus interest," DiBlasi, 542 N.Y.S.2d at 188-89 (emphases added); accord Pinto, 221 F.3d at 402; Pavia, 589 N.Y.S.2d at 517; see Gordon, 285 N.E.2d at 854

---

[8] The court rejects GEICO's argument that, because Kusulas never sought a lump-sum payment from GEICO, the Estate cannot recover the full measure of future damages in this bad-faith action. (See Mem. at 6-7.) CPLR 5044 permits a tort plaintiff to accelerate the payment of future damages in the event that the judgment debtor fails to make timely payment of periodic payments owed pursuant to the tort judgment. What the Estate seeks in this case is not an accelerated lump-sum payment, but rather a judgment in the amount of the Underlying Judgment.

(plurality opinion) ("For a breach of implied conditions of the contract to act in its performance in good faith in refusing to settle within the policy limits, the damages may exceed the policy limits."). The meaningfulness of the distinction between the amounts of judgment and liability was made clear by Rohring, in which the New York Court of Appeals held that Article 50-B does not "delay" or "alter" "liability," but instead simply "alter[s] how the liability [is] to be settled" by "ma[king] payment incremental." 638 N.E.2d at 65 (emphases in original); see Silvestri v. Smallberg, 671 N.E.2d 1267, 1268 (N.Y. 1996) ("[Article 50-B does] not delay liability, but merely make[s] payment of the judgment incremental . . . ."). By pegging the measure of damages available in a bad-faith action to the amount of the underlying tort judgment, New York courts have made clear that it is the initial adjudication of liability, rather than a subsequently reduced amount, that matters.

Because the amount of the Underlying Judgment differs from the amount of the liability in the Underlying Action, GEICO is also incorrect that, because the Estate could not "pursue the future-damages installments that were not yet due on October 17, 2016[,] from Saco, it necessarily follows that the [E]state cannot pursue those installments from GEICO either, as the assignee of Saco." (GEICO Reply at 3.) This statement only tracks if the damages Kusulas could have pursued from Saco following trial are equal to the damages Saco could have pursued in a bad-faith action against GEICO. As already established, these two damages amounts, while usually functionally equivalent,[9] are actually based on different values: the former on Saco's ongoing liability, the latter on the judgment entered against GEICO. The court thus cannot simply look at the Estate's possible ongoing recovery from Saco to determine its maximum

---

[9] This is, of course, because the tort plaintiff does not usually die before the bad-faith action can be adjudicated— and, when that unlikely situation has transpired, the amount of future damages has been under $250,000, see Stinton, 842 N.YS.2d at 479.

recovery from GEICO. Because Saco would be able to recover the full amount of the judgment from GEICO, by basic principles of assignment so too can the Estate recover this measure of damages.

Quoting the Second Circuit decision in Peterson v. Allcity Insurance Co., 472 F.2d 71 (2d Cir. 1972), GEICO claims that the value of bad-faith damages available in this action is equivalent to "how much . . . the verdict against [Saco or her assignee is] worth." (GEICO Reply at 9 (quoting Peterson, 472 F.2d at 79-80).) In making this argument, GEICO misconstrues the law of bad-faith damages in New York and what Peterson actually has to say about the matter before the court. The question in Peterson was whether the trial court erred in failing to charge the jury "that if they found [the plaintiff in a bad-faith action] 'judgment proof' they were to return a verdict for the defendant." 472 F.3d at 79. At the time, the most recent state opinion on bad-faith damages was Gordon. Dissenting in Gordon, Judge Breitel proposed that a semi-solvent insured—a description that also applied to the plaintiff in Peterson—should be able to recover an amount of bad-faith damages based on factors that "would be reasonably predictive of the insured's economic future, or that of his estate." 285 N.E.2d at 863 (Breitel, J., dissenting). The Second Circuit took Judge Breitel's view of the law to mean that a semi-solvent plaintiff "should only be entitled to recover to the extent that he has been or, in the reasonably foreseeable future, will be damaged by the outstanding judgment." Peterson, 472 F.2d at 79; see Levantino v. Ins. Co. of N. Am., 422 N.Y.S.2d 995, 1001-02 (Sup. Ct. Suffolk Cty. 1979). But the Second Circuit admitted that this view of the law was probably limited to Judge Breitel's dissenting opinion and, even if it had found support in Chief Judge Fuld's concurring opinion (thus garnering a majority of the Court of Appeals), this "sensible" and "realistic approach" would be "limited to the extreme case where the magnitude of the excess judgment is so great as to make

unjust, the imposition of liability to its full amount." Peterson, 472 F.2d at 80. In any event, the Second Circuit did not adopt such a rule in Peterson. See id. ("We cannot consider the verdict [for the full amount of the excess judgment] extreme or punitive."). Because the Second Circuit has more recently embraced the rule in the Appellate Division "that the insolvency of the insured does not bar recovery of excess judgment damages," Pinto, 221 F.3d at 402, the Peterson discussion of bad-faith damages is of limited utility. GEICO may believe that the discussion in Peterson "perfectly encapsulate[s]" the issue before the court, but the relevant statements in that decision are either inapplicable (see Estate Opp'n at 8 n.3) or not good law.

> 3. Purpose

As set forth above, the text of Article 50-B and relevant bad-faith damages law establish that it is the amount of the judgment, rather than the amount of the ongoing liability, that matters when determining bad-faith damages. Nevertheless, because the text of Article 50-B does not squarely address the question before the court, the court turns to the purposes underlying the relevant legal principles in this case and finds that they confirm that GEICO's motion must be denied.

Pointing to Stinton, GEICO argues that the New York State Legislature "intend[ed] to terminate a judgment debtor's liability for future damage awards upon the death of the judgment creditor." (GEICO Reply at 6.) That may be so, but at this point it is not totally clear whether GEICO or Saco remains responsible for the Underlying Judgment. (See Estate Opp'n at 13.) In any event, while the State Legislature's intentions as to Saco are relevant, it is more important to focus on its intentions as to GEICO and Kusulas.[10]

---

[10] As discussed above, Article 50-B was largely enacted to address the State Legislature's concerns with respect to the obligations and benefits of insurers and tort plaintiffs. See supra Section II(A).

In enacting Article 50-B, the main concerns that the State Legislature expressed with respect to insurers was that the cost of judgments was too high and that the insurer should be permitted to retain and invest the balance of future damages before installments were to come due. Even if there were a colorable argument that Article 50-B could apply to the action before the court, permitting the Estate to recover the full measure of bad-faith damages does not do harm to either of the State Legislature's concerns. As to the cost of judgments, the amount of money that the insurer would have had to pay out for the underlying tort claim remains bound by Article 50-B. This is not an illusory point. In actions where the total damages do not exceed the limits of the insurance policy, or where there is no argument that the insurer failed to settle the plaintiff's claim within the limits of the insured's policy, the plaintiff will not be able to recover what GEICO seems to think of as "additional" damages; where, however, the insurer's conduct is so egregious that the imposition of bad-faith damages is proper, it makes sense that the balance would shift away from limiting the cost of judgments and towards permitting the plaintiff to recover what she is able. At the same time, the question of which party should possess the future damages pending liability is much different in the instant context. If one accepts that the plaintiff ibn a bad-faith action deserves the full measure of the future damages upon granting of the bad-faith award, then there is no comparison between this situation and that of a normal structured tort judgment (where the plaintiff does not "deserve" the full measure of damages, beyond $250,000, until the damages accrue).

The State Legislature was also concerned about the possibility of overcompensation for tort plaintiffs. In Rohring, the Court of Appeals simultaneously clarified that the judgment and liability amounts are distinct and noted that Article 50-B "should not be construed in such a way as to increase the underlying liability owed by defendants," 638 N.E.2d at 64. Allowing the

Estate to recover the full measure of bad-faith damages in this case will not, however, "overcompensat[e]" the plaintiff, see id., because the Estate is entitled as a matter of law to the amount of the judgment that was entered against Saco. Accordingly, in Rohring, the Court of Appeals approved of a fee award based on "the amount awarded by the jury," but disapproved of a formulation that would have resulted in "defendants' combined payment to plaintiff and to plaintiff's counsel [actually exceeding] the amount awarded by the jury." Id. Because there is no risk that awarding the Estate the full measure of future damages awarded to Kusulas in the Underlying Action will result in the Estate recovering an amount greater than then Underlying Judgment, the concerns discussed in Rohring do not exist here.[11]

As a broader point, there is nothing to suggest that the State Legislature intended Article 50-B to apply to bad-faith actions. In the entire legislative record, there is no discussion of excess judgments or bad-faith recovery; all of the State Legislature's concerns related to the ability of the insurer to mitigate future damages that it might owe pursuant to a direct action (i.e., where the amount of money awarded falls within the policy limits). The State Legislature was surely aware of bad-faith actions, and their relation to personal-injury actions, when it drafted Article 50-B, so the absence of any mention of bad-faith actions from the legislative record is somewhat significant.

There are a number of other indications that allowing the Estate to recover the full measure of future damages as bad-faith damages accords with the intentions of the State Legislature. While Article 50-B terminates future-damages payments upon the death of the tort plaintiff, it simultaneously provides for the award of attorney's fees based on the present value of

---

[11] There is also evidence that the State Legislature was concerned that a victorious tort plaintiff would "squander[]" her future damages, thereby becoming a "public charge." See Report, supra, at 43-44. That concern is not relevant to this case.

the judgment—no matter what ends up happening to the plaintiff after entry of judgment. See CPLR 5041(c); Rohring v. City of Niagara Falls, 601 N.Y.S.2d 740, 743 (App. Div. 1993) (stating that, under Article 50-B, "attorney's fees . . . are to be paid up front"), aff'd, 638 N.E.2d 62. The State Legislature's intention to award attorney's fees immediately upon award of the tort judgment is clearly seen in the legislative history of Article 50-B. See Report, supra, at 200. The court recognizes, of course, that there is much difference between attorney's fees and subsequent bad-faith damages. The court merely mentions this provision of Article 50-B to establish that the State Legislature anticipated that the tort plaintiff's post-judgment death would not affect all monetary awards based on the initial judgment.

Finally, GEICO is correct that "punitive damages are not available in bad faith actions." (GEICO Reply at 8 n.5.) See, e.g., DiBlasi, 542 N.Y.S.2d at 192; see also Soto, 635 N.E.2d at 1225 ("[T]he punitive damages awarded against an insured in a civil suit are not a proper element of the compensatory damages recoverable in a suit against an insurer for a bad-faith refusal to settle."); AFIA, 527 N.Y.S.2d at 422 (distinguishing between "the comment that the rule of compensatory damages for bad faith in refusing to settle has a punitive aspect" and "the conclusion that a claim of bad faith, without more, provides a legally sufficient basis for seeking punitive damages"). That does not, however, mean that the essentially punitive nature of bad-faith actions, see CBLPath, Inc., 900 N.Y.S.2d at 465, is irrelevant to the question of what measure of damages can be imposed on GEICO. As discussed above, the availability of damages exceeding the limits of the policy is an extracontractual remedy; such a remedy is necessary in light of the egregious conduct that gives rise to a bad-faith claim. Permitting this extracontractual remedy to persist throughout the litigation thus accords with the intent of this

measure of damages: to compensate, but to a degree greater than one might expect given the contractual nature of the action.

*　　*　　*

Taken together, the text and purpose of both Article 50-B and New York bad-faith law lead the court to conclude that GEICO's motion in limine must be denied and that the Estate should be able to pursue the full amount of the excess judgment at trial. Having said that, the court understands that this question is a close one. If, at some later point in this case, the Second Circuit confronts the question that the court has sought to answer in this memorandum and order, the Second Circuit may find it useful to certify this issue to the New York Court of Appeals. Because district courts are not permitted to certify questions of state law to state courts, see Mayes v. Summit Entm't Corp., 287 F. Supp. 3d 200, 206 (E.D.N.Y. 2018), however, this court has made its best assessment of how the New York Court of Appeals would resolve the issue before the court. See Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity.").

## IV.　CONCLUSION

For the foregoing reasons, GEICO's motion to limit damages (Dkt. 148 in No. 12-CV-5633; Dkt. 60 in No. 15-CV-634) is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
　　　December _10_ , 2018

NICHOLAS G. GARAUFIS
United States District Judge